OPINION
Appellant sets forth the following two assignments of error:
 "I. THE EVIDENCE IS NOT LEGALLY SUFFICIENT TO SUSTAIN THE DEFENDANT'S CONVICTIONS
 "II. THE APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"
On March 2, 1995, Bryan Brown and Helen Hopkins' trailer caught fire. On October 24, 1995, appellant, James L. Walters, was indicted on one count of arson, in violation of R.C.2909.03(A)(1), a felony of the second degree, and one count of burglary, in violation of R.C. 2911.12(A)(3) [sic], a felony of the third degree, in connection with the fire at the Brown/Hopkins' trailer.
Although the indictment specified R.C. 2911.12(A)(3), which is a felony of the fourth degree, the elements of burglary in the indictment and the degree of the offense were identical to those of R.C. 2911.12(A)(2). Even though appellant was indicted with violating a different section number than he was found guilty of, we find that appellant was not prejudiced by this discrepancy. The purpose of an indictment is to give the accused person notice that he or she must defend against certain criminal charges and to afford protection from future prosecution for the same offense.State v. Sellards (1985), 17 Ohio St.3d 169, 170. See, also, R.C.2941.05 and Crim.R. 7(B). Because the indictment contained the elements and degree of R.C. 2911.12(A)(2), we find that appellant was placed on notice of the charge he was to defend against.
The matter proceeded to trial on May 27, 1997. On May 30, 1997, the jury found appellant guilty of both arson and burglary. Appellant was sentenced on June 11, 1997 to an indefinite term of incarceration of five to fifteen years for arson, and a definite term of two years for burglary, to run concurrently.
At trial, the state presented nineteen witnesses. Appellant also took the stand in his own defense. Generally, the scenario presented was that appellant had been living with his wife in New London, Ohio, in his niece's trailer. He and his wife had moved to Ohio toward the end of 1994. On or before February 28, 1995, after an altercation with his wife, appellant left his niece's trailer. He then moved in with Art and Jennifer Parker, whom he did not previously know, in exchange for doing tattoo work on Art. At some time prior to March 2, 1995, appellant had contacted the police and informed them that Greg Turner, his niece's boyfriend, was selling drugs. He also informed the police that Bryan Brown might have bought drugs from Turner. A search warrant was executed on the trailer of appellant's niece. Thereafter, on March 2, 1995, Bryan Brown went to the Parker trailer to confront appellant concerning his implication of Brown in drug activity.
On March 2, 1995, at around 10:00 a.m., Brown and appellant had an argument at the Parker trailer. Threats were allegedly made by both. Appellant went to the police station around noon complaining about being threatened by Brown. It is alleged that further threats of retaliation were made by appellant at this time. Appellant was at the bowling alley in the bar within, the Pocket Lounge, at around 3:00 p.m., drinking beer and talking with bartender Kim Ellison. Appellant and Kim discussed appellant's altercation with Brown and discussed the fact that Brown had fought with Kim's husband previously. Appellant left the bar around 5:30 p.m. Around 8:00 p.m., fire was discovered coming out of the Brown/Hopkins' trailer by the neighbors, no one was home, except for the dog. Appellant was next placed by the state's witnesses at the Pocket Lounge between 8:40 and 8:50 p.m. The time was noted because, after a patron announced that Brown's trailer was on fire, appellant stated to the patrons that he did not do it because he was present at that bar.
As appellant has asserted a manifest weight and sufficiency of the evidence argument, it is necessary to discuss the specific testimony that was presented.
James Brian Ferrell witnessed the fire. He testified that Robert Patchin busted the door window out and unlocked the door. Ferrell and Ted More then yelled into the trailer to see if anybody was there, but no one was home. Ferrell testified that he believed Hopkins and her daughter had left the trailer forty-five minutes to an hour before the fire. On cross-examination Ferrell testified that they did try the door before breaking the window. He further testified that there was another door to the trailer, but they did not attempt to open it. Ferrell did not see anyone suspicious or anyone start the fire. He testified that he did not know appellant. Ferrell put the time of the fire around 8:00 p.m.
Robert Patchin testified that he was watching television when he noticed the fire. He went to a neighbor's to have him call the fire department. Patchin testified that he was not involved in trying to get into the trailer. He thought the fire occurred at around 8:00 p.m. On cross-examination, Patchin testified that Ray Tolliver was attempting to get into the trailer in order to save the dog. Patchin thought that Tolliver had tried to open the back door, but testified that it appeared to be locked. He further stated that "it was hot, too, from the flames." Patchin testified that people tried to open the front door, which was on the same side of the trailer as the back door, but, it fell apart "[b]ecause that's where mainly the flames were." Patchin did not know how the fire started and did not know appellant.
Dennis Ray Tolliver testified that Robert Patchin came running over saying there was a fire. Tolliver had been at home with Brian Ferrell and Ted More drinking beer during the evening. Tolliver testified that he called 911 and went to Brown's trailer and opened the window and door, because they were his friends. He testified that this was around 8:00 or 8:30 p.m. He further testified that he went over there and "somebody kicked the door in or something, and they were looking for kids, but there was a dog; then the air conditioner fell down" and he just stepped back. The air conditioner fell out before he called 911. On cross-examination, Tolliver testified that he was unsure whether anyone tried to open the door before kicking it in, but he recalled seeing Mike Conley or somebody try to kick it in. He further testified that "[t]he living room door was already burnt down halfway and somebody just hit it and it fell off." But he was not sure who had done that. Tolliver also did not know appellant or how the fire started.
David Bowling was also a neighbor of Brown. He saw the fire, but did not know how it started. Bowling was on the opposite side of the trailer from the doors. He also did not know appellant.
Sal Midolo, former Chief of the New London Police Department, testified that he came in contact with appellant on March 2, 1995 at 12:30 p.m. when appellant and Art Parker came to the station. Midolo testified that appellant wanted to register a complaint for menacing against Brown due to an incident earlier that day at the Parkers' trailer. Appellant told Midolo that Brown threatened appellant and that he wanted appellant to come to the police station and tell them that he was lying about the information he provided about Brown. Midolo offered to take a statement and investigate the complaint. He further testified that appellant "was pretty agitated at the time, pretty angry, and decided not to [file a complaint]." Midolo stated that appellant said, "I'll take care of this myself." When asked by Midolo what he meant, appellant repeated, "I'll just take care of it myself." On cross-examination, Midolo was asked whether it was true that appellant was upset because the police department was not doing anything about Brown's threats. Midolo responded, "No, that was the first — to my knowledge, the first that he had made a complaint on Mr. Brown. And I offered to investigate it, to take a statement, to do an investigation. He declined, at that time, to press formal charges saying that he would just take care of it himself."
Edward Bryan Brown testified that he lived with his girlfriend, Helen Hopkins, and their daughter, Amber. Brown went to work around 1:30 or 2:30 p.m. on March 2, 1995. Earlier that day, however, he came in contact with appellant at the Parkers' trailer. Brown testified that appellant was mad at Greg Turner and had made up a bunch of accusations on a search warrant affidavit alleging that Turner was selling drugs and that Brown bought marijuana from Turner. The argument at the Parkers' concerned that matter.
Brown testified that he wanted to know why appellant was picking on him when he had done nothing to appellant, but been a friend. Brown was on probation at the time for a drug related offense and it was important for him not to get in trouble.
With respect to the confrontation, Brown testified that, at around 10:15 a.m., he confronted appellant at the Parkers' trailer. Brown testified that he asked appellant why he had lied about him and that appellant blamed his wife and niece for the accusations. Brown showed appellant the search warrant affidavit with appellant's name on it, at which point, appellant "got cocky with" Brown. Brown testified that he told appellant that if he had a problem with him, he should bring it outside and they would settle it. Brown testified that appellant's response was "you'll see who burns, or you'll see who's gonna burn," something to that effect, or "I'll see you burn." Brown then left. Brown testified that he did not interpret that as a literal statement. When asked whether he had any reason to be fearful when appellant told him that he would burn, Brown responded that he did have reason to be fearful because of things appellant said in the past. Brown testified that appellant "had mentioned before, times when he was drinking and stuff, that if people messed with him he had ways of taking care of them, that he had done this before in other states." Brown had no further contact with appellant that day. Brown was informed at work around 8:15 p.m. that his trailer was on fire.
On cross-examination, it was revealed that Brown never made mention in his written statement to the fire chief on March 4, 1995 that appellant had made the statement, "I'll see you burn" or "you'll see who's going to burn." Brown testified, however, that his mind was strained because of the stress of the fire. Upon further examination, Brown denied having been invited into the Parkers' trailer by appellant. Brown further testified that he had never fought with Art Parker; however, years earlier, he had fought with Jennifer Parker's brother. On redirect, Brown testified that of the other people Brown had fought with over the years, no one else threatened to burn him up on March 2, 1995.
Kimberly Ann Ellison was a bartender at the Pocket Lounge and was working the afternoon shift, from noon to 5:30 p.m., on March 2, 1995. She testified that appellant came into the bar between 3:00 and 4:00 p.m. She and appellant discussed Brown. Ellison informed appellant that she felt Brown was an "asshole" because shortly after she and her husband moved to New London, Brown got into a fight with her husband. Ellison testified that appellant said Brown "was tough or he was a big man or something to that effect," in a sarcastic manner.
Ellison stated that she came in contact with appellant again in the bar between 8:40 and 8:50 p.m. Ellison was bowling with her league on March 2, 1995. She testified that she had been in and out of the bar throughout the evening getting drinks for her teammates. Ellison further testified that she did not see appellant in the bowling alley until after she had finished bowling, at approximately 8:40 p.m., when she went into the bar.
When she entered the bar after bowling, she saw appellant who called her over. While talking to him, a patron came in and said that Bryan Brown's trailer was on fire. At that point, appellant asked Ellison to look at the clock and tell him what time it was, it was 8:50 p.m. He then wanted her to look at the date on the calendar in the bar. After that, appellant asked her to "Yell my name; tell everybody this is J.R. [appellant]." Ellison testified that she did these things. Ellison then testified that she told appellant that she did not like Bryan Brown, but she would not wish this on her worst enemy, to which appellant responded, "Well, don't worry, I take care of my friends." Concerned that it was against the law not to tell anyone what appellant had said, Ellison told her boss about the conversation.
On cross-examination, Ellison testified that she knew appellant was not in the bar earlier because he would have said, "Hi." She also testified that he was not in the pool area of the bowling alley because, although she could not see in there from where she was, she would have heard appellant if he and Jeff Evans were playing pool. When asked whether she told Officer Dane Howard that appellant had burned Brown's trailer on account of loyalty to her, Ellison stated:
 "No. I said I felt bad or something to that effect, that if I had anything to do with it, but no, I did not say he had loyalty to me, no, I did not. If I helped instigate it I was sorry, because J.R. had said to me that he takes care of his friends, but I don't really remember ever saying loyalty. I don't say loyalty to anything."
She was further questioned, "Did you do anything to make — to lead Dane Howard into thinking that?" Ellison responded:
 "Yes, I was upset about it, yes. I thought if J.R. considered me a friend, that if that helped him in — if he did this, if that helped him in his decision to do something like that, that I felt bad about it, yes, I did.
 "And if it did, then I'm sorry, but yeah, it bugged me that I called the man an asshole and then his house got burned. I think it would bug anybody."
Ellison finally testified that she did think that appellant considered them friends and that he knew she did not like Brown, but she did not "think he burned the trailer down because [she] said [Brown] was an asshole * * *."
Kathy Ward was also a bartender at the Pocket Lounge who knew appellant, but not personally. She also had been bowling on March 2, 1995 and had been in and out of the bar throughout the evening. She testified that she came into the bar at 8:50 p.m. after bowling and saw appellant. She further testified that he had not been in the bar prior to that time. At 8:50 p.m., Craig Smith came in and told of the fire. Ward testified that, at that point, appellant jumped up and said, "You guys know where I was; you know I was here, I was here at the bowling alley at that time." Ward stated that appellant came over and talked to her and told her he had been in a fight with Brown over something to do with drugs. She also stated that he appeared "fidgety" to her. When asked if appellant gave any other signs that something was wrong, Ward stated, "When they said it was Bryan Brown's trailer, yes, J.R. did act kind of scared and bouncing around the Pocket Lounge from one place to the other like he was trying to let his appearance be known at that time."
Martha Miller, Helen Hopkins' mother, was looking for Hopkins' trailer at 7:45 p.m. on March 2, 1995. Miller knew that her daughter had moved and lived in a trailer, but did not know where because they did not have a close relationship. She stopped a police officer to see if he knew. While they were talking, he received a call regarding a trailer fire in the same trailer park to which he had just given Miller directions. Miller testified that she went to the trailer park and found her daughter watching her trailer burn. After staying with Hopkins for awhile, Miller gave her thirty roses for her birthday and left.
Tracy Turner Munger, appellant's niece, testified that she invited appellant and his wife to come stay with her and "get a fresh start." Tracy testified that she had kicked appellant out of her trailer a day or two before the fire because they had been in an argument and he threw a broom at her and hit her in the stomach, knowing she was pregnant. She testified that he stated she would "burn for this." After that incident, possibly the same day, her home was subject to a search warrant. As a result of the warrant, paraphernalia, seed, or something that belonged to appellant was taken from her home.
On March 2, 1995, Tracy was with Hopkins running errands. Hopkins was in Tracy's trailer having dinner, approximately two to three blocks from the Brown/Hopkins trailer, at the time she was notified of the fire.
On cross-examination, Tracy insisted that she, not appellant's wife, had kicked him out of the trailer. She also testified that she had previously been to the Brown/Hopkins trailer for a party where there was drinking and smoking of cigarettes. Tracy knew that appellant had told the police that her husband, then-boyfriend, Greg Turner, and Brown were engaged in drug activity and that she was upset with appellant for reporting such. She also stated that the only drug activity in her home was being done by appellant. Tracy denied that she was making this allegation solely to get back at appellant for what he had done. Tracy testified that she had no idea who started the fire and that appellant never told her he had.
Rebecca Gilbert was living with the Parkers in March 1995. Gilbert testified, however, that when appellant moved in for a week or two, she did not sleep there because he gave her "the creeps." Gilbert was present on the morning of March 2, 1995 during appellant's confrontation with Brown, around 10:00 or 11:00 a.m. She testified that she was sitting on the couch when Brown pulled in the driveway. According to Gilbert, appellant said, "That's for me," and went to the door where he and Brown started arguing about the statements appellant made about Brown. Gilbert then stated that appellant said he did not write any statements and he had nothing to do with it. Gilbert testified that when appellant came back inside, he told her he was not going to fight, "that he'd pay him back another way," but he did not say how he was going to pay him back.
That evening, between 10:00 and midnight, Gilbert came back to the Parkers' trailer and found appellant present. At that time, Gilbert testified that appellant told her that Brown's trailer burnt down, and he laughed about it. She told him that, because of what had happened earlier, he would get blamed for it, and he said, "no, because he was at the bowling alley." According to Gilbert, appellant was intoxicated while she was talking to him. Gilbert further testified, "Maybe the day after [the fire] he had told me that he would burn Bryan's ass, and if anybody fucked with him they'd get hurt."
Gilbert identified a can of Zippo lighter fluid as one that looked like one the Parkers' kept to fill their lighters. The price tag said it was purchased at Servistar; however, Gilbert testified that she did not know of one in New London and stated that Art Parker always purchased the lighter fluid. Gilbert testified that the lighter fluid was always kept on the middle shelf. She had used the lighter fluid approximately three weeks to a month before the fire. She stated that the cans of lighter fluid were usually pretty full. At trial, she stated the can was empty.
On cross-examination, Gilbert was asked if she remembered appellant saying to Brown, "you'll see who burns," or "you'll see who's going to burn?" Gilbert testified that the statements sounded very familiar and that something was said like that. In her statement to the police on March 5, 1995, Gilbert told the police that appellant had told her he would burn Brown. Even after the fire, Gilbert testified that appellant continued to make statements that he would burn Brown.
Teresa Boggs was also a bartender at the bowling alley. On the Saturday night following the Thursday, March 2, 1995 fire, Boggs saw appellant come into the bar really fast and talk with Jeff Evans. Boggs testified that appellant said to Evans that he was in big trouble and needed his help, to which Evans responded, "Okay, let's go." She never saw appellant after that time.
Beatrice Puckett owned the trailer that was burned. She testified that just prior to Brown and Hopkins moving in the trailer, she had work done on the furnace and had the electric wiring checked.
Helen Hopkins testified that she lived in her trailer with her boyfriend, Bryan Brown, and their daughter, Amber. They had a dog, lizards and fish that were all lost in the fire. Hopkins testified that they had been living there approximately six months. On the day of the fire, she had stopped in the house briefly around 5:00 or 5:30 p.m. and noticed nothing wrong with the house. Her daughter had a television and a stereo normally in her room; however, the stereo was not plugged in because they had just been rearranging the room. Hopkins testified that when she left the house, she locked the door, but noted that the trailer was not difficult to get into because a credit card could be used to pop the door open without hurting the trim or anything else. She further stated that she had once used a thin ice scraper to open the door.
On cross-examination, Hopkins testified that she and Brown did not smoke and that, although she allowed smoking in her home, she discouraged it by hiding the ashtrays. She further testified that she was sure nothing was left on because she had a habit of turning everything off to save on electricity. The only flammable liquids in the house were some rubbing alcohol or peroxide in the bathroom and polish remover. She testified that she did have some cleaning supplies, ammonia, and bleach but not a lot of chemical cleaners. Hopkins testified that during her stop home at 5:00 or 5:30 p.m., Amber and her friend were in Amber's room picking out a doll each. As they were leaving, Hopkins went through and closed Amber's bedroom door because the dog was still a puppy.
Dan Bailey was a volunteer fireman who was called to the scene of the fire around 12:15 a.m. on March 3, 1995. The fire chief thought that the cause of the fire was either electrical, because Hopkins told him they had had some difficulty with an outlet in Amber's room, or was the furnace. Bailey testified that he was called in to determine whether it was a possible arson case that would require the State Fire Marshal being called. Upon examining the scene, Bailey testified that it appeared the fire started two to three feet west of the furnace in the center of Amber's room, low to the ground.
The following day, Bailey returned to the scene and removed the debris piece by piece, doing a "dig out," to determine whether the fire marshal had to be called. Bailey testified that he found the suspect outlet and determined that there was no evidence of short circuiting. Bailey also testified that Amber's bedroom door had been opened against the wall of the furnace area during the fire. Bailey further testified that there was no evidence of any fire inside the furnace. Once the debris had been washed away, Bailey testified that he observed what he believed were pour patterns on the floor. Dane Howard was called to verify Bailey's findings. Thereafter, the State Fire Marshal's office was called.
Dane Howard was a patrolman with the New London Police Department on March 2, 1995. He had just spoken with Martha Miller before getting the call concerning the fire. The fact that he ran into Miller immediately before he got the fire call made him suspect her. However, she was later ruled out as a suspect. Howard testified that the Parkers' home was approximately one city block from the bowling alley. Howard also testified that on March 2, 1995, before the fire, at 6:45 p.m., he encountered appellant outside the rear door of the police station. Art Parker was driving the car that pulled into the station while Howard was outside talking with someone. Howard testified that appellant, who was very upset, approached him about the search warrant matter and Brown threatening appellant. Bailey testified:
 "And he was upset with me that I named him in [the search warrant] and asked me if I named him, and I told him that I did. He became very irate and agitated. He started making demands, stuff that there is no way I could come through with. He said that I — wanted us to take some action against Bryan Brown for threatening him.
 "I explained to him the procedure for filing charges, he wasn't happy with that. He became very irate and agitated, started screaming and yelling just stated, as he was walking away, if you don't — going to do anything — * * *
 "`If you ain't going to do any fucking thing, I'll get me some payback.' So that was the last contact I had with him that day."
Appellant did not explain of what the payback consisted.
Howard attempted to verify appellant's whereabouts on March 2, 1995. Howard testified that he verified appellant's whereabouts as follows: appellant was at the Parkers' between 10:00 and 11:00 a.m. during the confrontation with Brown; he was at the police station at 12:30 p.m.; before returning to the station at 6:45 p.m., appellant was at the Pocket Lounge drinking beer; and after the fire, appellant was at the bowling alley at 8:50 p.m. Howard was unable to verify that appellant was at the Parkers' at 8:03 p.m. when the fire call came in. Approximately thirty to forty people were interviewed to obtain this information.
The day after the fire, Howard received the empty can of Zippo lighter fluid from the Parkers. Howard testified that the Parkers informed him that the can was three-quarters full the day before and that it was found on the bottom shelf of the cabinet where it was kept, rather than on the middle shelf. Howard indicated with his fingers the amount that the Parkers told him was in the can.[1] The can was fingerprinted, but no latent prints were identifiable.
Because Jennifer Parker had told the police that appellant had made some incriminating statements, she was sent with a microcassette recorder to talk with appellant. Howard testified that appellant could not be heard throughout most of the tape because a child's voice was also on the tape.[2]
Howard testified that appellant was interviewed concerning his whereabouts on March 2, 1995. Howard stated that appellant was adamant that he was at the Parkers' "until twenty minutes after the fire call came in and walked directly to the bowling alley" and that he talked with Ellison and she would be his alibi. Upon telling appellant that the Parkers said he was not there, appellant began telling Howard that he was at various places, the pool hall, McDonalds, the bowling alley. Howard testified that appellant also gave a second story which included doing some tattooing that day. Howard further testified that appellant could not be pinned down as to either time or place.
When questioned about what threats Brown had made to appellant during their confrontation, Howard testified that appellant told him Brown threatened to burn him. During questioning, Howard also testified that appellant told him he had handled the can of lighter fluid and that there had been some amount in it.
On cross-examination, Howard was asked if, besides Martha Miller, he pursued any other suspects. Howard responded, "All the circumstances clearly pointed that [appellant] was the person that set the fire * * *" and that there were no other suspects. Howard denied being upset with appellant because the results of the drug raid were minimal. Howard also denied that appellant told him as payback he was going to go tell Brown's probation officer what had happened. Howard testified that he stood by while appellant moved out of the Parkers' trailer. Howard had asked appellant to do so because the Parkers were afraid of appellant. With respect to Kim Ellison, Howard testified that she told him that "she believed that [appellant] had burned Bryan Brown's trailer out of some sort of loyalty to her."
On redirect, Howard testified that appellant indicated he knew where Brown lived. Howard also testified that it was a ten minute walk from the Parkers' trailer to Brown's trailer. Howard further testified that appellant told him that his fingerprints would be on the lighter fluid because he had used it a few days before and that he was the person who had put it on the lower shelf, lying face down.
Donald Edwards testified that appellant did some tattoo work on him, but could not remember when.
Donna Davidson was also a barmaid at the Pocket Lounge. She came to work at 5:30 p.m. on March 2, 1995 and noticed appellant at the bar. She testified that appellant left thirty to forty minutes later after having one beer. She also testified that he returned to the bar between 8:30 and 9:00 p.m.
Richard Patton, investigator for the State Fire Marshal's Office, testified that the fire was intentionally set. He testified that there were pour patterns in the areas coming into the door of the bedroom and coming down the hallway and back up into the bathroom. He also testified that it was not caused by the furnace or an electrical outlet. Patton further testified that "* * * the fire started in both the bedroom and the bathroom, with a trailer in between with a flammable or combustible liquid and igniting most probably when it went out the door of the trailer it just fed both of them." He stated that the fire probably took fifteen minutes to do the damage it did. He further stated that Zippo lighter fluid could have been the flammable liquid involved and that three-quarters of a can could have done the damage he saw, but it was unlikely that one ounce of lighter fluid could have done the damage.
Nevertheless, on cross-examination, Patton testified that he could not be sure it was Zippo lighter fluid that caused the fire. He also testified that no accelerants were found at the scene. However, on redirect, Patton further testified that the volunteer fire department used a great deal of water on this scene.
Jeffrey Evans testified for the defense that he saw appellant at the bowling alley and was asked by appellant if he could stay with Evans for the night. Evans testified that he knew nothing about the fire and that he heard nothing to indicate that appellant was in trouble with the law.
As his only other witness, appellant testified at length in his own defense. In pertinent part, appellant testified that he was an acquaintance of Greg Turner and Bryan Brown, who were friends. Although appellant stated that he never had a disagreement with Greg, he testified that, because drugs were being used around his niece's daughter, he went to the police with information concerning Turner's drug activity. Appellant testified that he told the police that Turner was dealing drugs and told them that Brown might have purchased some from Turner. Appellant asserted, however, that he never wrote anything down and was upset with the police for not informing him that a search warrant would be executed. According to appellant, he gave Officer Howard this information approximately one month prior to the fire.
Appellant testified that on February 27 or 28, after a fight with his wife, he left his niece's trailer and went to the pool hall in town, not the one in the bowling alley. Appellant testified that the owner of the pool hall offered to let appellant stay in the basement of the pool hall. While there, Art Parker came into the pool hall. Appellant testified that he did not previously know Parker. After talking, it was agreed that appellant would stay with the Parkers for a week in exchange for tattoo work on Art. Appellant went to the Parkers' home around February 28, 1995.
Appellant testified that on March 2, 1995, he had an incident with Brown at the Parkers' trailer. Appellant stated that Brown confronted him concerning the search warrant. Although appellant testified that he told the police that Brown may have purchased drugs, appellant testified that he told Brown that he had not implicated him. Appellant testified that he told Brown that appellant's wife may have implicated Brown, because appellant only made statements to the police concerning Turner. The following exchange took place at trial concerning Brown's conversation with appellant:
 "A. He told me, he goes, `you better go down to the police station and change your statement,' he said, `or I'm going to burn you.'
"Q. He said he was going to burn you?
 "A. Yeah, I mean that's just plain slang is all that is. It is street talk.
Q. How did you take it?
 "A. It kind of upset me. I told him, I said, `listen,' you know, `you're not going to burn me, because I —
"Q. Is that what you said next?
 "A. The best of my knowledge, I said, because you know, I didn't do nothing, and I told him, `I'll go down to police station and try to get the matter straightened out.'
 "Q. Did you ever say to Bryan Brown after he made that statement to you about you're going to burn, did you then make a statement to him like, `you'll see who burns?'
"A. No.
"Q. Or did you say, `you'll see who's going to burn?'
"A. No.
"Q. Did you say `I'll see you burn?'
 "A. I believe I made that statement, yeah, `I'll see you burn.'
"* * *
"Q. What did you mean by that statement?
 "A. Because that was in reference — because I knew right at that time, he was on parole and I'd went to his parole officer.
"* * *
 "Q. * * * Again, when you said `I'll see you burn,' did you mean that statement literally? Do you know what I mean?
"A. You mean as far as burning his house?
"Q. Well —
 "A. No, I would never burned [sic] his house or something stupid like that.
 "Q. When you made the statement, did you mean you were going to actually set fire to him?
"A. No, no, no, no. That's —
"Q. So what did you mean when you said that?
 "A. I mean I'll call his parole agent, let his parole agent say, you know, hey, give the guy a urine test and see what's going on in — for instance like that, they'd burn him. So, so it's a slang again.
 "Q. Can you give us a definition of that? What slang term means?
 "A. My intention to burn somebody was to get him in trouble, yeah, to get him in trouble."
Appellant further testified that Rebecca was inside the Parkers' trailer at the time of the incident, but he did not know exactly where. Nevertheless, appellant conceded that she could have been within earshot. After the confrontation, appellant testified that he sat on the couch and Rebecca asked him what was going on. Appellant testified that he told her Brown was upset about the search warrant and further stated, "I'm not afraid of the man." Appellant then testified that he went on to say he would "just go to the cops." Appellant stated that he told Rebecca he was not going to fight Brown because, as appellant testified, "[t]he man is too big to be fighting with." Appellant denied saying, "I'll get paid back another way."
Appellant then testified that he went to the police station to determine why his name was on the search warrant. While there, he spoke with Midolo who, according to appellant, refused to allow appellant to file a complaint. When asked if he made a statement to Midolo that he would take care of the matter himself, appellant responded as follows:
 "A. No, I didn't make no threats, I said, you know, I told him, I'll go to the parole agent. I take that back. I asked him if he had his parole agent's phone number or know [sic] who his parole agent was at that time. Told me no.
 "I was, you know, I don't know if I indicated to him that I was going to call his parole agent on him or not, but I did ask him."
Appellant testified that he returned to the police station around 6:00 or 6:30 p.m. and talked to Officer Howard concerning why his name was on the search warrant. Appellant testified that he was not satisfied with Howard's response. Appellant was then asked:
 "Q. Do you recall Dane Howard's testimony? Do you recall saying a statement that goes something like, `if you ain't going to do any fucking thing, I'll get me some payback'?
 "A. My words to Dane Howard were, you know, the first part, but I didn't say nothing about no payback. I said, `I'll take care of this, you know, myself then.'"
Appellant went on to testify that, by this, he meant, "I was going to get a hold of Bryan's PO, because that's, if anybody knows anything about parole agents or probation agents, you call one of them up, they're going to investigate something."
After speaking with Howard, appellant testified that he and Art went to the grocery store and then went home or to the pool hall at the recreation center around 8:00 p.m. He then testified that he left the trailer with a beer around 8:30 p.m. and walked to McDonald's for a hamburger. He ate the hamburger while walking to the bowling alley, arriving a little before 9:00 p.m. After arriving at the bowling alley, he stayed in the pool hall section for ten to fifteen minutes before going into the bar area. Appellant testified that he could not recall whether he was at the Parkers' home when they heard about the fire on the police scanner, or whether the first time he heard of the fire was at the bowling alley.
Appellant then testified concerning his conversations with Kim Ellison. He stated that he spoke with Kim around 3:00 or 4:00 p.m. and discussed Brown. Appellant testified that, in response to Ellison stating that Brown once jumped on her husband, appellant responded, "he's kind of a big man to be jumping on somebody," meaning that Brown was literally a big man, sizewise. Appellant also testified with respect to his conversation with Ellison later in the evening. Appellant testified that someone came in the bar and stated that Brown's trailer was on fire. Appellant then testified that Ellison "looked right at me, because we was sitting there talking and she said, `you know, you're going to get blamed for this.'" Appellant testified that he responded, "`no, no, I'm not; I'm here,' you know, and that's when I said, `look at your watch, what time is it?'" According to appellant, the time was 8:40 or 8:50 p.m. The following testimony was adduced:
 "Q. Do you remember saying anything like `hey, everybody, I'm here or J.R. is here?'
 "A. I said `hey, check this, I'm here.' I said, `I'm not out there running up and down the streets,' you know. I said, `I've been in here and I have been in here for a while, you know, there is no way I was even near the place.'"
Apparently deciding that he was not at the Parkers' when they allegedly heard about the fire on the police scanner, appellant testified that he returned to the Parkers' trailer between 10:00 and 11:00 p.m. and told them that Brown's trailer had caught fire. Appellant stated that Jennifer Parker told him he would get blamed for this, to which appellant responded, "`there is no way I should get blamed for this because I was at the bowling alley * * *.'" No mention was made of the fact that appellant was allegedly with Art Parker between 6:00 and 8:30 p.m.
Appellant testified that he was not upset about the fire because people felt that Brown had it coming because of his reputation and because he messed with people. Appellant admitted chuckling about the fact that Brown's house burned. Appellant, however, denied that he told Gilbert, "I'll burn Bryan's ass. If anyone fucks with me, they get hurt."
On March 4, 1995, appellant left the Parkers' home at the behest of the police. Appellant testified that he was confused about the fact that the Parkers feared him because he had never done anything to them. Appellant had no place to stay. He testified that he ran into Jeff Evans and Evans allowed him to spend a night with him. On March 5 or 6, appellant left town to stay with friends in West Virginia. When asked if he was under arrest when he left, appellant stated:
 "A. No. As a matter of fact, I was run out of the police station. I was told to leave the police department because I wanted to ask them questions about hey, what's going on here, you know. I was wanting to get to the bottom of things, because I had no problems with Bryan."
In fact, appellant testified that he was shocked that the police suspected him.
Appellant further testified that he used the lighter fluid to fill up his and Art Parker's lighters when he first got to the trailer. He stated that there was a quarter of a can left. He also stated he could have returned the can to the bottom shelf of the cabinet instead of the middle shelf.
On cross-examination, appellant was questioned about a conversation he had with Jennifer Parker, and stated:
 "* * * I didn't know she was wired at all. I knew she was asking a lot of questions.
 "Q. You remember saying in that conversation that your old lady's going to be next; do you remember that?
"A. No, I never said nothing about that.
 "Q. Didn't you even admit that to Dane Howard you said that you were just mad when you said that?
 "A. I don't know; I could have said that my old lady — I could have said my old lady is going to be next, you know, but I wasn't referring to no fire. My wife was out of the state then, she was living in — back home."
Finally, appellant denied leaving the Parkers' at 7:15 that night.
We have previously applied the State v. Jenks (1991),61 Ohio St.3d 259, standard of review to both sufficiency and manifest weight of the evidence claims. However, the Supreme Court of Ohio has ruled that "the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380,386.
"Sufficiency" applies to a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of a crime. Id. Upon review of the sufficiency of the evidence to support a criminal conviction, an appellate court must examine:
 "the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
If a defendant's conviction is reversed based upon the sufficiency of the evidence, the defendant goes free. Thompkins, supra at 387.
However, under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. Id. at 387. The appellate court,
 "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
Additionally, a reversal on the ground that it is "against the weight of the evidence" must be by concurrence of all three judges and the defendant is then granted a new trial. Thompkins, supra
at paragraph four of the syllabus. Since appellant's assignments of error encompasses both sufficiency and manifest weight issues, we must apply both standards.
R.C. 2909.03(A)(1) states, "No person, by means of fire or explosion, shall knowingly do any of the following: (1) Cause, or create a substantial risk of, physical harm to any property of another without his consent." If the value of the property is five thousand dollars or more, anyone who violates this section is guilty of arson, a felony of the second degree.
R.C. 2911.12(A)(2) states, "No person, by force, stealth, or deception, shall do any of the following: * * * (2) Trespass in a permanent or temporary habitation of any person when any person is present or likely to be present, with purpose to commit in the habitation any misdemeanor that is not a theft offense." Anyone who violates this section is guilty of burglary, a felony of the third degree.
Upon a thorough review of the evidence and the above testimony, we find that, if believed, the evidence admitted at trial was sufficient to convince the jury of appellant's guilt beyond a reasonable doubt. After viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of arson and burglary proven beyond a reasonable doubt. The testimony supported the following facts: Brown's trailer was intentionally set, from within the trailer, with an unknown accelerant, appellant was upset with Brown on the day of the fire after having had an argument with Brown, appellant threatened to burn Brown, said he would take care of the situation himself, said he would get payback himself, said to an acquaintance that he took care of his friends when she told him she did not like Brown, appellant had access to a can of lighter fluid that was three-quarters full the day before the fire and empty the day after, appellant knew where Brown lived, Brown lived within a ten minute walk of the Parkers', and the Parkers lived within a city block of the bowling alley. Appellant had no one to corroborate his alibi for the time period when the fire would have been set, sometime shortly before 8:00 p.m.
Additionally, upon reviewing the entire record, and after weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that the jury did not clearly lose its way. Appellant attempted to explain his reasons for making certain statements about burning Brown and getting payback; however, upon review of all the testimony in the trial, his explanations did not appear credible. In light of the overwhelming circumstantial evidence against appellant and the lack of credible evidence in his favor, we find that appellant's conviction was not against the manifest weight of the evidence.
Accordingly, appellant's first and second assignments of error are found not well-taken.
On consideration whereof, this court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Huron County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED.
 Melvin L. Resnick, J.
 James R. Sherck, J.
 Richard W. Knepper, J.
CONCUR.
[1] No one said in front of the jury how far apart his fingers were, but during later arguments outside the jury's presence, it came out that his fingers were only one to one and a half inches apart. The can in evidence is approximately six and a half inches tall.
[2] We note that neither Parker testified. According to discovery papers in the record, their current address was Ft. Myers, Florida.